**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Patricia Hughes, mother and
Administratrix of the Estate of Allene
J. Hughes,

      Plaintiff,

      v.

Kia Motors Corporation, et al.,

      Defendants.

:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.

1:11-cv-02733-JOF

## ORDER

      This matter is before the court on Defendants' motion to exclude [63]; Defendants'

motion for summary judgment [64]; Defendants' motion to strike [89]; and Defendants'

motion to strike [90].

## I.    Background

### A.    Facts Alleged in Complaint

      Plaintiff, Patricia Hughes, as mother and administratrix of the Estate of Allene

Hughes, filed this products liability action against Defendant, Kia Motors Corporation and

Kia Motors America, Inc.  For the purposes of these motions, the parties agree that on the

evening of May 2, 2005, Allene Hughes was driving a 2004 Kia Optima.  She pulled out of

the parking lot of a Waffle House in Chattanooga, Tennessee and turned left onto Club

Drive, not following the flow of traffic.  She drove a short distance to a five point intersection at Brainerd Road and North Moore Road.  As she entered the intersection, she was struck on the driver's side by a tractor trailer truck.

After the initial impact with the truck, the Kia continued through the intersection, up and down the curbs of a grass island at the corner convenience store, back across Brainerd Road and into the Waffle House parking lot.  There, the Kia ran into two other parked cars and then over a  curb and through a wooden fence, through bushes and shrubs, onto a lawn, back into Club Drive, over street curbs, back onto the lawn, hit a tree, knocked down a metal flagpole and the metal supports of a car port awning, over landscaping timber made of stone or wood, before crashing into a house and stopping.  Allene Hughes was taken to the hospital and died from her injuries the next day.  Loraine Hughes, Allene's cousin, was a passenger in the front seat of the car, and survived her injuries.

Plaintiff alleges that the 2004 Kia Optima was defective in its design by failing to incorporate an automatic fuel cut-off mechanism or electrical power shut off device that would have cut off the fuel to the engine as a result of the impact from the truck.  Plaintiff contends that had the Kia been so equipped, the car would not have continued on after the impact with the tractor trailer and would not have sustained the additional impacts prior to finally crashing into the house and coming to a stop.  Plaintiff argues that Ms. Hughes would not have sustained fatal head injuries had the car stopped after the impact with the truck.

2

Defendants argue that Plaintiff cannot establish causation for her "enhanced injury" theory of the case because Plaintiff cannot preclude the possibility that Allene Hughes suffered her fatal injuries at the time of impact with the tractor trailer and not during the time the Kia continued to operate after the crash.

To support her theory of the case, Plaintiff has proffered the expert testimony of Dr. Joseph L. Burton, a medical doctor and expert in forensic and injury analysis, who worked for many years as a medical examiner for several counties in the metro Atlanta area. Defendants have filed the instant motion to strike Dr. Burton's testimony contending it does not meet the standards set forth in *Daubert*.

### B.      Dr. Burton's Expert Report and Deposition Testimony

In his expert report, Dr. Burton opines that Allene Hughes died of blunt force trauma that occurred mainly on the left side of her head.  *See* Report, at 3.  As to the manner in which Allene sustained her injuries, Dr. Burton stated that he began his analysis by relying on the accident report of Ralph Cunningham.  *Id.* at 6.  According to Mr. Cunningham's reconstruction, the tractor trailer was operating between 10 and 24 miles per hour.  The Kia's driver's side curtain air bag deployed but the driver's front air bag did not deploy because it had not been replaced from a previous accident.  *Id.*  Dr. Burton also gleaned from Mr. Cunningham's report that longitudinal "delta v" (a measure of the magnitude of the change in velocity) from the impact with the tractor trailer was 8 miles per hour.  *Id.* at 7.

3

The "inward crush" at the driver's door and "A" pillar was an intrusion of 20 inches.  *Id.* at 8.  The crush lessened as it moved back along the car indicating that the impact with the tractor trailer was a "side swipe" of sliding contact.  *Id.*  Dr. Burton opined that Allene did sustain a head injury due to her head moving toward the "intruding structures" of the Kia. *Id.*  After the impact with the tractor trailer when the car continued to travel, Dr. Burton states Allene's head would have had the "opportunity" to interact with the car's steering wheel and instrument panel (due to the lack of air bag) in a way that could cause brain injury "in a manner which would either exacerbate or potentially cause her brain injury."  *Id.*

Dr. Burton states it "is my opinion that the fact the Kia did not stop operating in a timely manner after the initial impact with the Mack Truck was contributory or causative of Ms. Hughes' brain injuries."  *Id.* at 9.  "It is my opinion that had the Kia stopped in a timely manner and did not have the additional impact it is more to a reasonable degree of forensic, medical, and scientific probability that Ms. Hughes would not have sustained a fatal brain injury."  *Id.*  Dr. Burton stated that his opinions were reached using the scientific method.  *Id.* at 11.

Dr. Burton was deposed on May 3, 2012.  Dr. Burton testified that to understand the injury, he must assess what forces were acting on Ms. Hughes at the time of the accident. *See* Burton Depo., at 12-13 ("Not only how much [the forces] were, but where they were coming from and how they were impacting, in this case, the package the person was in, the

Kia in this case.").  Dr. Burton also testified that with respect to a side impact, the two critical factors were "amount of intrusion" and "velocity of the interior" of the "part of the vehicle that is adjacent to the occupant," which in this case was the door.  *Id.* at 27.

Dr. Burton testified that he considered the longitudinal delta-v for the Kia, which was 8 miles per hour according to Mr. Cunningham's report.  *Id.* at 26.  But he recognized that Mr. Cunningham had not calculated a delta-v for the transverse or lateral (side) direction. *Id.*  Dr. Burton was then asked:

> Q:  Knowing the change in velocity from a lateral direction was not something you wanted to know as part of your analysis of injury causation in this case?
>
> A:  Not really.  I would be more interested in the speed the vehicle was going when it made the contact and the amount of intrusion which I already knew to be approximately 20 inches at the hinge pillar.

*Id.* at 29.

Defendants' counsel also asked Dr. Burton:

> Q:  Have you determined what the velocity of the driver's door in the Kia was in this case?
>
> A:  I think Cunningham's report says that the truck had slowed to something like 12 miles an hour, something like that.  That means the front of the truck is moving at 12 miles an hour which means at some point in time the door panel or part of the Kia, its interior, will be moving at approximately 12 miles an hour also.

*Id.* at 27.

5

Although Mr. Cunningham's report did not calculate the lateral delta-v, Defendants' counsel asked Mr. Cunningham during his deposition to make the calculation.   *See* Cunningham Depo., at 67-70.  Mr. Cunningham answered that the lateral or transverse delta-v was approximately 37 miles per hour.   *Id.*   When Defendants' counsel presented this information to Dr. Burton at his deposition, Dr. Burton agreed that the velocity of the Kia door at impact with the tractor trailer would have to be higher than the 8 miles per hour he originally believed.  *See* Burton Depo., at 33.  Dr. Burton testified:

Q:   What velocity based on your review of Mr. Cunningham's report had you concluded that the interior door was traveling as a result of the impact with the Mack truck?

A:   I think I said about 15 minutes ago I assumed around 12 miles an hour. If I assume hypothetically that it hit it at 38 miles an hour, or 35, then at some point in time part of the interior structure of the Kia was moving at that speed.

Q:   And so if the assumption you're making of Mr. Cunningham making that approximately 37-mile-per-hour delta-v is in fact true, you would not agree with me that at some point in that impact between the Kia and the Mack truck part of that driver's door was traveling at least 35 miles per hour.  Is that fair?

A:   That's fair.

*Id.*

Significantly, Dr. Burton then testified that:

Q:   If the delta-v in the impact between the Mack truck and the Kia in a lateral, or side to side, direction exceeded 35 miles per hour, you would agree that that's sufficient change in velocity acting upon the

6

vehicle and then acting upon the driver of that vehicle to have caused a fatal brain injury?

A:    I would agree that it could have caused a fatal brain injury.

Q:    And would you hold that opinion to a reasonable degree of medical certainty?

A:    As you worded your question and as I answered it, yes sir, in that it has the potential at that speed to cause a fatal brain injury and could have caused a fatal brain injury.

*Id.* at 43.

When asked about the consequences of the other impacts after the tractor trailer, Dr.

Burton testified:

Q:    But as I parse those words, you're not of the opinion that the impact between the Mack truck and the Kia in fact was the impact that was the cause of her fatal injury in this case?

A:    My opinion is that I don't know enough about the other impacts to exclude them. . . . . So I know those are all possibilities.  And did that happen here versus the Mack truck impact?  I don't know.  I'm certainly not going to embarrass myself by arguing with somebody that the Mack truck impact couldn't produce a fatal injury because I would look ridiculous and whatever credibility I might have to a jury or to a court I would lose if I tried to say that there's no way that a Mack truck impact could have killed this lady.  I wouldn't say that.

*Id.* at 43-44.  His testimony continued:

Q:    So for all of the other impacts other than the Mack truck, you don't have enough acceleration or deceleration information to make an analysis with respect to those impacts and the likelihood that during one of those impacts Ms. Hughes impacted some part of the Kia; is that correct?

> A: Well, I know enough about curb impacts and things like that to know that it has the potential to cause her injury and to have her impact a structure from it.  Did it and what structure was it, I don't have enough information to answer that part of the equation.

*Id.* at 64-65.  Dr. Burton further stated:

> Q: And you don't hold to a reasonable degree of medical and scientific certainty the opinion that Ms. Hughes' brain injury was in fact caused by some event after the impact with the Mack truck; is that correct?

> A: I hold the opinion that it is more likely than not that it was because I believe that torso bag offered her significant protection in that Mack truck impact.

*Id.* at 71.

### C. Contentions

Defendants argue that Dr. Burton's testimony cannot pass the *Daubert* standard because his analysis ignores the force with which the tractor trailer hit the Kia and instead focused only on the longitudinal (front to rear) deceleration of the Kia after it was hit by the tractor trailer.  Defendants also state that Dr. Burton's "differential diagnosis" is faulty because he is not able to exclude the initial impact with the tractor trailer from being the sole cause of Ms. Hughes's brain injury.

Plaintiff responds that under Tennessee law, she need only be able to show that the lack of a fuel shut off was a "substantial factor" in Ms. Hughes's injury.  Plaintiff avers that she need not rule out the possibility that Ms. Hughes suffered her fatal injury at the time of the tractor trailer impact and therefore, Defendants' criticisms of Dr. Burton's "differential

8

diagnosis" testimony do not warrant exclusion under *Daubert*.  Plaintiff further contends that Dr. Burton testified that a delta-v may be a helpful piece of information but it is not always meaningful to the particular circumstance.  Here, Dr. Burton found that because the side impact between the Kia and the tractor trailer was not at a direct 90 degree angle, but rather at 12 degrees forward of 90 degrees, the amount of intrusion by the tractor trailer was a more significant factor than the lateral delta-v.

## II.   Discussion

### A.   *Daubert*

#### 1.   Legal Framework

Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."  *Id.*  In interpreting this Rule, the Supreme Court has imposed a special gatekeeping role on trial judges, instructing them to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).[1]  While *Daubert* spoke in terms of scientific expert testimony, the Court has

---

[1]Defendants make no argument with respect to Dr. Burton's qualifications.  It is undisputed that he is a medical doctor with a speciality in forensic and injury analysis.  For 22 years, he worked as a Chief Medical Examiner in various metro Atlanta counties.  He has evaluated hundreds of automobile accidents to determine causes of injury and death to

subsequently made clear that there exists "no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge," and the gatekeeping obligation therefore applies to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Under *Daubert*'s reliability prong, a trial court must ensure that the proposed testimony is supported by appropriate validation. In other words, to be reliable, expert testimony must be premised on "good grounds." *Daubert*, 509 U.S. at 590. To facilitate a determination of reliability, the Court provided a list of four factors courts should consider: (1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant community. *Id.* at at 593-94; *see also Kumho Tire*, 526 U.S. at 149 (indicating that trial judge must determine whether expert testimony has reliable basis in knowledge and experience of relevant discipline). These four factors, however, "do *not* constitute a definitive checklist or test," and the "gatekeeping inquiry must be tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150 (internal quotations and citations omitted). As the Supreme Court has explained, the applicability of the factors mentioned in *Daubert* often depends on the "particular circumstances of the particular case at issue." *Id.*

---

passengers in the vehicles, including at least 300 side impact collisions. Given the lack of argument on this point, the court presumes that Dr. Burton is qualified.

In addition to ensuring the reliability of expert testimony, the trial court must equally ensure that the proposed expert testimony is relevant. *Daubert*, 509 U.S. at 591. Another way to approach *Daubert*'s relevancy requirement is to describe it, as did the Court, as an issue of "fit." *Id.* The testimony, in other words, must be relevant to the task at hand. *See Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (describing relevant expert testimony as that which "logically advances a material aspect of the proposing party's case") (internal quotations omitted). "Fit," therefore, addresses the requirement that the testimony actually assist the trier of fact in understanding the evidence and deciding the case at bar. *See* Fed. R. Evid. 702.

Under *Daubert* and its progeny, then, expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to discuss; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Allison*, 184 F.3d at 1309; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004); *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998); *Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1310 (N.D. Ga.) (Forrester, J.), *aff'd* 212 Fed. Appx. 916 (11th Cir. 2006).

2.   <u>Tennessee Tort Law</u>

Plaintiff argues that under Tennessee substantive tort law, she need not exclude the tractor trailer impact as the cause of Allene Hughes's fatal brain injury.[2]  Rather, a plaintiff need only show that the alleged defect in the defendant's manufacture of the car was "a substantial factor in bringing about [her] harm" in order to establish a prima facie case of causation.  *See Williams v. Ford Motor Co.*, 1986 WL 110681 (W.D. Tenn. 1986).  Once a plaintiff has established prima facie causation, Plaintiff argues, then the burden shifts to the defendant to apportion the harm among others it claims are responsible for the accident.  *Id.*

Defendants respond that Tennessee products liability actions require a plaintiff to demonstrate causation-in-fact before even getting to proximate cause.  *See Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 705 (Tenn. 2011); *see also Bara v. Clarksville Memorial Hospital*, 104 S.W.3d 1 (Tenn. Ct. App. 2002) ("Thus, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established.").  Defendant avers that Plaintiff cannot establish cause-in-fact

---

[2]As a federal court sitting in diversity, the court must apply the substantive state law of Georgia.  *See*, *e.g.*, *McMahan v. Toto*, 256 F.3d 1120, 1131-32 (11th Cir. 2001). Substantive state law also includes the choice of law rules of the state.  *Id.*  The parties agree that under Georgia's choice of law for torts – *lex loci delicti* – Tennessee tort law would apply as the place of the injury.

because she cannot preclude the possibility that Ms. Hughes sustained her fatal head injuries during the impact with the tractor trailer.

In *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004), the Eleventh Circuit addressed the intersection of Rule 702 *Daubert* issues with state substantive rules of law. *Id.* at 1294. The court first stated that the "admissibility of expert testimony is a matter of federal, rather than state procedure." *Id.* at 1294-95. However, "[s]ome state evidentiary rules are substantive in nature, and transcend the substance-procedure boundary, creating a potential *Erie* conflict." *Id.* at 1295. Under Federal Rule of Evidence 601, "when State law supplies the rule of decision, the competency of a witness shall be determined in accordance with state law." *Id.* (citing Fed. R. Evid. 601).

In *McDowell*, the court recognized that in order to prove medical malpractice in Georgia, a plaintiff had to present medical testimony as to causation. *Id.* However, once a plaintiff met the burden of producing a competent expert, the court would still need to engage in a Rule 702 analysis because Rule 702 is "designed to ensure fair administration" of the case. *Id.* Thus, the court must discuss "first whether the expert is qualified to render an opinion regarding the standard of care (the competency component), and second, whether the expert's causation theory meets the strictures of Rule 702." *Id.* *See also Long v. Raymond Corp.*, 245 Fed. Appx. 912, 915-16 (11th Cir. 2007) (noting that Rule 601 goes toward competency of expert while Rule 702 addresses admissibility of expert testimony

13

and stating that even if expert is "competent to testify on a substantive issue in the case" district court must still "screen the testimony under Rule 702 to determine if it is otherwise admissible expert testimony").

It is without dispute that Tennessee recognizes an "enhanced injury" tort claim; that is an injury "over and above the probable result of an accident absent the [design] defect." *See generally Williams v. Ford Motor Co.*, 1986 WL 110681 (W.D. Tenn. 1986) (citing *Ellithorpe v. Ford Motor Co.*, 503 S.W.2d 516 (Tenn. 1973) and *Mitchell v. Volkswagenwerk*, 669 F.2d 1199 (8th Cir. 1982)). As one might expect, establishing standards for causation in such cases is problematic. Different states have taken different approaches. Tennessee utilizes the "substantial factor" test. *Id.* Under the "substantial factor" test, "[o]nce a plaintiff proves that each defendant contributed substantially to his injuries, and that his injuries were such as to make it impossible for him to apportion them between defendants, the burden would shift to defendants to apportion the injury among themselves or be held jointly and severally liable as joint tortfeasors." *Id.* In *Williams*, the court held that

> Tennessee courts will require crashworthiness plaintiffs suffering indivisible injuries to prove that each defendant was a substantial factor in bringing about his harm in order to establish proximate causation *prima facie*. The burden of apportioning the injuries then shifts to defendants, who are jointly and severally liable unless they are able to determine which of them caused what portion of the harm. To survive summary judgment in this action, accordingly, Plaintiff must show only that his injury is indivisible, and that

14

both the other parties to the action and the allegedly defective design were substantial factors in causing his injury.

*Id.* at \*3.[3]

However, the Tennessee Supreme Court has made clear that general notions of causation still apply in enhanced injury cases. In *Whitehead v. Toyota Motor Corp.*, 897 S.W.2d 684 (Tenn. 1995), the Court considered whether the principles of comparative fault would apply to enhanced injury cases where the defective product did not cause or contribute to the underlying accident. The Court held that comparative fault would apply because "[a]ny claim for 'enhanced injuries' is nothing more than a claim for injuries that were *actually and proximately caused* by the defective product." *Id.* at 694 (emphasis in original). The Court used an example of a plaintiff driving a car and getting involved in a two-car accident for which plaintiff was entirely at fault. If the plaintiff incurred $100,000 damages as a result of the accident and plaintiff is barred from recovering from the other driver through plaintiff's fault, the plaintiff could bring an action against the car manufacturer stating that the seat belt system was defective and with a proper system, he would have suffered only $50,000 damage. The manufacturer cannot be held liable for the

---

[3]Georgia also applies the "substantial factor" test. *See Polston v. Boomershine Pontiac-GMC Truck, Inc.*, 262 Ga. 616 (Ga. 1992) (holding in "an enhanced injury or crashworthiness case, Georgia law places on the plaintiff the burden of proving that a design defect was a substantial factor in producing damages over and above those which were probably caused as a result of the original impact or collision").

15

first $50,000 in damages which would have been incurred even if the seat belt system were properly designed. *Id.* at 695.

Likewise, here, even under "enhanced injury" in Tennessee tort law, Plaintiff must show actual and proximate cause under her theory of the case. Plaintiff contends that the Kia's design is flawed because it does not contain an electrical cut-off inertia or fuel cut-off switch. This alleged defect came into play ***after*** the tractor trailer impacted the Kia. Thus, in order for this alleged defect to be causally relevant, Plaintiff must show that the impact with the tractor trailer did not cause Plaintiff's fatal brain injury. This reality is a consequence of Plaintiff's theory of the case in this circumstance and applies even in light of the "substantial factor" language of Tennessee tort law. The lack of an electrical cut-off inertia switch cannot be a "substantial factor" in Plaintiff's fatal injury if she had already sustained that injury at impact with the tractor trailer. It is within this context that the court must consider Dr. Burton's testimony.

3.   Application as to Lateral Forces

Dr. Burton opines that "had the Kia stopped in a timely manner and did not have the additional impact it is more to a reasonable degree of forensic, medical, and scientific probability that Ms. Hughes would not have sustained a fatal brain injury." *See* Expert Report. While Dr. Burton states that his opinions were reached using the scientific method, he does not explain how the scientific method assisted him in reaching these conclusions.

16

He did review the accident reconstruction report of Mr. Cunningham and did review the types of injuries sustained by Ms. Hughes, but Dr. Burton does not explain how the scientific method directed him to his conclusions.

Furthermore, to the extent that Dr. Burton testified as to any methodology relevant to accident reconstruction, he stated would need to consider the forces acting upon the injured person. *See* Burton Depo., at 12-13.  He stated that he would want to know "not only how much [those forces] were, but where they were coming from and how they were impacting – in this case – the package the person was in, the Kia in this case." *Id.*  He agreed that force involves magnitude, direction, and amount of time the force acts. *Id.*  However, in formulating his opinions about the crash here, Dr. Burton did not consider the lateral delta-v from the impact between the Kia and the tractor trailer. *Id.* at 26-29.  Because Dr. Burton failed to consider the lateral forces, Defendants argue that he did not follow even the methodology that he, himself, testified would be applicable.  The fact that Dr. Burton has testified that the lateral delta-v is not as important in a "side swipe" case does not relieve Dr. Burton of his own stated methodology, particularly where – as the court next discusses – the velocity of the driver's side door has been called into question.

Dr. Burton also testified that it would be important to know the velocity at which the driver's side door of the Kia moved toward Ms. Hughes. *Id.* at 27.  Dr. Burton presumed that would have been 12 miles per hour based on the velocity of the tractor trailer at impact.

17

*Id.* During his deposition, however, Dr. Burton was informed that Mr. Cunningham had later determined that the lateral delta-v was approximately 37 miles per hour. *Id.* at 33. Upon learning this, Dr. Burton admitted that the driver's side door would have to have been traveling at a velocity of at least 35 miles per hour, not the 12 miles per hour that he had presumed. *Id.* Knowing this, Dr. Burton testified that a delta-v of 35 miles per hour could have caused a fatal brain injury. *Id.* at 43 ("it has the potential at that speed to cause a fatal brain injury and could have caused a fatal brain injury").

Although *Daubert* allows for trained experts to form conclusions by extrapolating from existing data, the expert's opinion is not admissible under *Daubert* if the opinion is connected to that data only through the *ipse dixit* of the expert. Dr. Burton's opinion is based on his review of the investigation, the accident reconstruction, and the medical reports combined with his experience as a forensic pathologist and participation in innumerous accident investigations. But this is simply Dr. Burton's *ipse dixit*. This combined with the apparent flaws in Dr. Burton's understanding of the velocity at which the door of the Kia moved toward Ms. Hughes renders Dr. Burton's opinion inadmissible.

Moreover, part of the scientific method is attempting to falsify one's conclusions. *See Daubert*, 509 U.S. at 593 ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what

18

distinguishes science from other fields of human inquiry.").[4]  Defendants correctly argue that

Dr. Burton was neither able to rule out the initial impact with the tractor trailer as the cause

of Ms. Hughes's fatal brain injury, nor was he able to identify any particular impact after the

tractor trailer which might have caused a fatal brain injury.  Dr. Burton readily admitted that

he did not know enough about the other impacts the Kia sustained after the initial impact

with the tractor trailer to determine whether Ms. Hughes suffered her fatal brain injury at

any other point in the sequence of events.[5]  For these reasons, the court GRANTS

Defendants' motion to exclude the testimony of Dr. Burton [63].

---

[4]The parties have argued this point under the rubric of "differential diagnosis."  The Eleventh Circuit explains the terms "differential diagnosis:"

> Technically, a differential diagnosis refers to a method of determining which of two diseases a patient suffers from, whereas differential etiology is a term used to describe the process by which the cause of an injury is determined.  Following the trend among federal courts, however, we will use the term differential diagnosis to refer to both concepts.

See Guinn v. AstraZeneca Pharmaceuticals LP, 602 D.3d 1245, 1253 n.6 (11th Cir. 2010).  The court finds that regardless of the characterization given to the argument, the point is whether Dr. Burton was able to rule out the tractor trailer impact as the cause of Ms. Hughes's fatal brain injury or whether he was able to pinpoint any particular impact after the tractor trailer's as the likely cause.  He was not able to do either.

[5]As the court explains below, even considering any additional information garnered from the testimony of passenger Loraine Hughes, Dr. Burton's testimony still would not pass muster under Daubert.

**B.**     **Miscellaneous Matters with Supplementation**

Defendants ask the court to strike the supplemental report of Dr. Burton filed on

August 27, 2012. *See* Docket Entry [72].  Federal Rule of Civil Procedure 26 requires that

a party disclose to other parties any expert witnesses who may be used at trial to present

evidence. Fed. R. Civ. P.26(a)(2)(A). Furthermore, this disclosure is to be accompanied by

a written report signed and prepared by the witness, which report is to contain: a complete

statement of all opinions and the basis therefor; the data or other information used by the

witness in forming the opinion; any exhibits to be used; the qualifications of the witness;

compensation to be paid to the witness; and a listing of other cases in which the witness has

testified within the preceding ten years. Fed. R. Civ. P. 26(a)(2)(B). This court's local rules

provide that "[a]ny party who desires to use the testimony of an expert witness shall

designate the expert sufficiently early in the discovery period to permit the opposing party

the opportunity to depose the expert . . . ." LR 26.2C, N.D. Ga. Any party failing to comply

with the foregoing requirement "shall not be permitted to offer the testimony of the party's

expert." *Id. See also* Fed. R. Civ. P. 37(c)(1) (stating that party who, without substantial

justification, fails to disclose or supplement information required by Rule 26(a) "shall not

. . . be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or

information not so disclosed").  Here, under the Amended Discovery Plan, Plaintiff was

required to disclose her expert witnesses and reports by April 13, 2012.  Although an initial

20

report of Dr. Burton was filed near that deadline, Plaintiff later filed supplemental expert reports and "additions" to Dr. Burton's deposition testimony on August 27, 2012.

Plaintiff is correct that under Rule 26(e), parties have a continuing duty to supplement their Initial Disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. . . ." *See* Fed. R. Civ. P. 26(e).  With respect to expert witnesses, Rule 26(e) provides:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition.  Any additions to changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

*Id.* Rule 26(e)(2).  Rule 26(a)(3) states that pretrial disclosures must be made at least 30 days before trial. *Id.*

The court, however, rejects Plaintiff's argument that supplemental expert reports may come in through the back door of Rule 26(e) duty to supplement requirement.  Allowing a party to use Rule 26(e) to make an end-run around the expert disclosure requirements would defeat the purpose of the report requirement.  *See Cochran v. Brinkmann Corp.*, 2009 WL 4823858 (N.D. Ga. 2009) (Duffey, J.) (noting Rule 26(e) was "not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones to perfect

a litigation strategy"), *aff'd* 381 Fed. Appx. 968 (11th Cir. 2010); *see also Mitchell v. Ford Motor Co.*, 318 Fed. Appx. 821 (11th Cir. 2009) (affirming district court decision to exclude expert opinions rendered after deadline); *Goobys Creek, LLC v. Arch Ins. Co.*, 2009 WL 1139575 (M.D. Fla. 2009) (Rule 26(e) exists to impose duty to supplement, not to grant any "right to produce information in a belated fashion"); *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 662 (N.D. Ga. 2001) (Forrester, J.) ("Rule 26 does not, however, bestow upon litigants unfettered freedom to rely on supplements produced after a court-imposed deadline, even if the rule's pretrial time limit is satisfied.  In short, Rule 26 imposes a *duty* on Plaintiffs; it grants them no *right* to produce information in a belated fashion.").  Nor does the court find that the supplements made by Dr. Burton are substantially justified or harmless.

Plaintiff contends that Dr. Burton supplemented his report based on the testimony of passenger Loraine Hughes who was not deposed until July 30, 2012.  While the information Dr. Burton gleaned from the testimony of Loraine Hughes might be reason for some supplementation, her testimony is not what lead Dr. Burton to believe that the impact from the tractor trailer was a "side swipe."  In his supplemental declaration, *see* Docket Entry [73], Dr. Burton states that if the lateral delta-v had been 37 miles per hour, then the intrusion on the driver's side door of the Kia would have been greater than 20 inches at the A-pillar (the front door hinge).  *See* Supp. Decl., ¶ 5b.  He further states that the pattern of

intrusion on the driver's side starts at 20 inches at the A-pillar and diminished to 14.5 inches on the b-pillar. *Id.* This is all information that comes from Mr. Cunningham's report and deposition of which Dr. Burton was previously aware. Dr. Burton further supplements by stating that the nature of Allene Hughes's injuries are not what one would expect from an impact that involved a lateral delta-v of 37 miles per hour. *Id.* at ¶ 5c. Again, this is information Dr. Burton had before he filed his report. Finally, Dr. Burton's supplemental statement that it is unlikely the driver's seat front air bag would have deployed had it been in the car because the passenger front air bag did not deploy is pure speculation and also information he had at the time of his report and deposition. *Id.* ¶ 5d.

One proposed addition does relate to Loraine Hughes's testimony. Dr. Burton proposes to add a Paragraph 5a to his report which states that because Loraine Hughes testified that she experienced a "hard impact pitching her forward and striking the Kia's interior dash" at the time that the Kia collided with the house, Dr. Burton opines that "Allene Hughes's head would have more likely than not struck an interior portion of the Kia (the steering wheel, instrument panel, gear shifter, or dashboard) exacerbating or aggravating an existing brain injury. This impact with the house would have been sufficient to exacerbate or aggravate Allene Hughes's non-fatal brain injury in addition to the other additional impacts the Kia sustained after the impact with the Mack Truck including striking curbs, striking the two vehicles in the parking lot, crashing through the wooden fence, striking a

tree, metal awning supports and flag pole, and solid landscaping barrier, and jerking motions produced by the Kia traversing the terrain in its course of travel of over 600 feet." *See* Supp. Report, ¶ 5a.

The only piece of evidence Dr. Burton cites for this new opinion is Loraine Hughes's testimony that when the Kia struck the house, she experienced a "hard impact pitching her forward and striking the Kia's interior dash." Dr. Burton gives no methodology for how this one piece of information changed his prior deposition testimony that he could not determine the severity of the other impacts because he did not know enough about them to his new testimony that the impact with the house aggravated non-fatal brain injuries Allene Hughes had already sustained. Loraine Hughes's testimony offers no information about the velocity of the Kia at the time of impact with the house or the position of Allene Hughes's body during the later impacts. Other than Loraine Hughes's description of a "hard impact," there is no objective fact upon which Dr. Burton could have based his supplemental conclusion that the impact with the house exacerbated an already-existing non-fatal brain injury Allene Hughes may have sustained at impact with the tractor trailer. As the court described above, it is possible for an expert to base an opinion on extrapolations from existing data, but here Dr. Burton has not connected his opinion to this data through anything other than his *ipse dixit* views. This is particularly problematic where this leap is based on layperson testimony that offers no indication of the velocity or degree of impact of the car during the post-tractor trailer events.

24

As the court stated above, Dr. Burton also states in his supplemental report that the 37 mile per hour value testified to by Mr. Cunningham is incorrect because Ms. Hughes did not suffer the physical injuries that one would expect with a 37 mile per hour impact.  In addition to the timeliness problems outlined above, Dr. Burton did not give any scientific basis for this conclusion other than his testimony that Ms. Hughes's injuries are not consistent with an impact at that velocity.

Finally, Plaintiff also filed a document entitled "Additions" to Dr. Burton's deposition testimony.  *See* Docket Entry [71].  This document purports to be some kind of expanded errata sheet compiled by Dr. Burton.  While one of the notations made is typical of errata sheet addendums to a deposition and corrects a typographical error, the remainder of Dr. Burton's "Additions" consist of entirely new testimony in the form of direct responses to Defendants' *Daubert* motion.  For example, he adds a new statement that it "is not my opinion that the impact of the Mack truck into Ms. Hughes's vehicle is the cause of her fatal brain injury.  It is my opinion that it could have contributed to her brain injury."  *See* "Addition," Docket Entry [71], at 4.  This is a substantial change to Dr. Burton's deposition testimony and there simply is no procedural mechanism for making such a filing.  There is no rule which permits an expert to add more testimony his report and deposition in the form of "Additions" to his deposition testimony.

As such, the court GRANTS Defendants' motion to strike [89] and GRANTS Defendants' motion to strike [90].

**C**      **Defendants' Motion for Summary Judgment**

Now that the court has resolved to exclude the expert testimony of Dr. Burton, the court turns to Defendants' motion for summary judgment. Defendants contend that in light of the exclusion of Dr. Burton's testimony, Plaintiff does not have any evidence from which a jury could conclude that Allene Hughes's injuries and death were proximately caused by any alleged defect in the Kia. Furthermore, Defendants assert that even if Dr. Burton were permitted to testify that it was possible Allene Hughes suffered her fatal injury during one of the impacts which occurred after the tractor trailer, Dr. Burton testified that it was "possible" that Ms. Hughes suffered a brain injury as a result from an impact with the steering wheel or instrument panel. This testimony, however, would also not be a sufficient basis upon which to reach the jury because Dr. Burton stated those impacts were possible due to the fact that the driver's front air bag in the car had not been replaced after a previous accident. Defendants claim that under Tennessee statute, Plaintiff could not recover on this theory because the car was not in the same condition as it was at the time it left the control of the manufacturer. Finally, Defendants argue in this case, under Tennessee law, there is no basis for an award of punitive damages.

Plaintiff responds that there is sufficient evidence before the jury that the lack of a fuel cut-off switch was substantial factor contributing to Plaintiff's injury. Plaintiff also states that Tenn. Code Ann. § 29-28-108 does not apply here to bar liability because that statute only applies if the vehicle is not in a unreasonably dangerous condition at the time

it leaves the control of the manufacturer. Plaintiff contends it was unreasonably dangerous at the time it left the manufacturer's control because it lacked a fuel cut-off switch. Further, Plaintiff argues that there is no evidence to show that the driver's front air bag would deploy when the passenger front air bag did not deploy. Finally, Plaintiff avers that Georgia law on punitive damages would apply to this case because it is a matter affecting a remedy.

The court has determined above that Dr. Burton (1) cannot exclude the initial impact with the tractor trailer as the cause of Ms. Hughes's fatal injury and (2) cannot determine which of the subsequent impacts might have caused Ms. Hughes's fatal injury. Plaintiff contends, however, that even without this information, under Tennessee law, the vehicle manufacturer is still not entitled to summary judgment citing *Sigler v. American Honda Motor Co.*, 532 F.3d 469 (6th Cir. 2008) and *Caldwell v. Ford Motor Co.*, 619 S.W.2d 534 (Tenn. Ct. App. 1981).

The court finds *Caldwell* in apposite. In *Caldwell*, the plaintiff was a home builder who drove his Ford truck to a work site where it unexpectedly burst into flame. The plaintiff injured himself while attempting to quickly unload building supplies from the back of the truck. The plaintiff sued Ford arguing that if the truck had not caught fire, he would not have unloaded the materials in a fast fashion which is what lead to his debilitating back injury. First, *Caldwell* is not an "enhanced injury" case, but rather is a proximate cause/chain of causation case. Ford argued that the plaintiff would have unloaded the building supplies even if the truck had not caught fire. The court found that the plaintiff had

27

provided sufficient evidence that he had unloaded the materials differently and with less care to his well-being due to the truck's catching fire.  Second, the procedural posture of *Caldwell* was a review of a jury's verdict awarding damages to the plaintiff.  Third, in *Caldwell*, the plaintiff had provided evidence in the form of testimony from his physicians that his back injury was caused by the manner in which he was quickly "slinging" the building materials out of the bed of the truck due to the fire.  Finally, *Caldwell*, itself, recognizes that under Tennessee's view of proximate cause, the "first" inquiry is "cause in fact.  If the inquiry shows that defendant's conduct, in point of fact, was not a factor in causing plaintiff's damage, that ends the matter."  *See* 619 S.W.2d at 540-41 (citing *Carney v. Goodman*, 270 S.W.2d 572 (Tenn. Ct. App. 1954)).  Defendants here argue that Plaintiff cannot pass the cause in fact threshold.

In *Sigler*, the plaintiff was driving on I-75 at approximately 75 miles per hour when her Honda Accord veered off the road, drove down an embankment, through a fence, and hit a tree.  The air bag in the Accord did not deploy in the accident.  The plaintiff presented some evidence that the air bag should have deployed if the vehicle – upon collision with the tree – experienced a rapid deceleration from a speed of 25 miles per hour.  She also testified that she hit her head in the car after the car impacted with the tree and this "second" collision caused injury which aggravated a preexisting seizure disorder.  *See* 532 F.3d at 474.  The district court excluded experts offered by the plaintiff and granted summary judgment to Honda because (1) the plaintiff proffered insufficient evidence to show that a defect in the

air bag caused it not to deploy and (2) the plaintiff offered no evidence connecting the "second" collision inside the vehicle to her injuries and enhanced injuries. On appeal, the Sixth Circuit found error in the district court's consideration of several unsworn expert statements submitted by Honda. *Id.* at 480. The Sixth Circuit also found that the district court had improperly excluded plaintiff's expert witness who would testify as to the speed of the car on impact with the tree.

With respect to the "crashworthiness" or "enhanced injury" claims, the plaintiff submitted testimony of a doctor that assuming the vehicle was traveling at least 20 miles per hour and assuming that the plaintiff's head struck the interior of the vehicle during the collision, he could state that "within a reasonable degree of medical certainty, such trauma to the head more than likely aggravated or exacerbated her preexisting seizure disorder." *Id.* at 488. The Sixth Circuit found that this testimony was a sufficient basis upon which a reasonable jury could conclude that the defective air bag "was responsible to some degree" for enhancing the plaintiff's injuries. *Id.* at 489. The Court of Appeals rejected the district court's holding that the plaintiff had not separated injury from the tree from injury due to the impact with the Accord's interior.

Plaintiff's situation here is different, however, because Plaintiff's expert cannot testify that the impacts after the tractor trailer caused the enhancement of Ms. Hughes's injury. Plaintiff's own expert also has testified that it is possible Ms. Hughes suffered her

fatal injury at the time of the impact with the tractor trailer.  Thus, the plaintiff in *Sigler* had different expert evidence to proffer to a jury.

As the court explained above, even under Tennessee's "enhanced injury" "substantial factor" standard, a plaintiff must still show that it is the defect in Defendants' car that was a "substantial factor" in her enhanced injury.  To do so in this case, Plaintiff must have some evidence that Ms. Hughes did not sustain the enhanced injury in the initial impact with the tractor trailer – an event that occurred without any relation to the alleged defect in the Kia. Plaintiff cannot do that here because she has no testimony that Ms. Hughes either did or did not suffer her fatal brain injury at the time of the impact with the tractor trailer.  In fact, Plaintiff's own expert testifies that "I'm certainly not going to embarrass myself by arguing with somebody that the Mack truck impact couldn't produce a fatal injury because I would look ridiculous and whatever credibility I might have to a jury or to a court I would lose if I tried to say that there's no way that a Mack truck impact could have killed this lady.  I wouldn't say that." *See* Burton Depo., at 43-44.  No reasonable jury could conclude under these circumstances that the alleged defect in the Kia was a "substantial factor" in the enhanced injury to Ms. Hughes.

Even accepting Dr. Burton's testimony that Ms. Hughes "could have possibly sustained the brain injury . . . as a result of her head's contact with the steering wheel and/or instrument panel during the additional impacts the Kia experienced," Plaintiff cannot demonstrate proximate cause to the alleged defect of lack of a fuel cut off switch.  The

30

parties agree that the driver's side front air bag had deployed in a previous incident and had never been replaced.  Dr. Burton testified that Ms. Hughes's head had the opportunity to interact with the steering wheel or instrument panel because there was no air bag to prevent interaction and that such interaction could have exacerbated or caused her brain injury.  *See* Burton Expert Report, at 8.[6]  Thus, the only testimony in the record is that any injury sustained by Ms. Hughes after the tractor trailer impact occurred as a result of her head impacting with the steering wheel or instrument panel and Dr. Burton's testimony that this occurred because of the lack of air bag.  There is no evidence in the record from which a reasonable juror could conclude that the lack of a fuel cut off caused Plaintiff's enhanced injuries under the circumstances where the car's air bag was not replaced.[7]

For the foregoing reasons, the court GRANTS Defendants' motion for summary judgment [63].

---

[6]The parties argue this point with reference to Tenn. Code Ann. § 29-28-108 which provides that if "a product is not unreasonably dangerous at the time it leaves the control of the manufacturer or seller but was made unreasonably dangerous by subsequent unforeseeable alteration, change, improper maintenance or abnormal use, the manufacturer or seller is not liable." *Id.*  The court finds it need not resolve any dispute about whether the car was "unreasonably dangerous" when it left the manufacturer due to the lack of a fuel cut off switch because this is more appropriately an issue of causation.

[7]Plaintiff argues that the lack of an air bag is not determinative because the passenger front air bag did not deploy in the impact with the house.  Plaintiff, however, has proffered no evidence that if a passenger side air bag does not deploy, then the driver's side air bag would not deploy.  Furthermore, there is no dispute that the driver's side curtain air bag did deploy.

### III.     Conclusion

The court GRANTS Defendants' motion to exclude [63]; GRANTS Defendants' motion for summary judgment [64]; GRANTS Defendants' motion to strike [89]; and GRANTS Defendants' motion to strike [90].

The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiff's complaint.

**IT IS SO ORDERED** this 29th day of January, 2013.


 S/   J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)